UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

**STEPHEN L. FARRAR**,

Case No. 6:15-cv-00952-KI

              Plaintiff,

OPINION AND ORDER

    v.

**COLETTE S. PETERS, Director of
O.D.O.C.; MICHAEL F. GOWER, Assist.
Director; BOB CULP, Central Trust
Manager; S. SHELTON, M.D., Medical
Director, C. COFFEY, RN, OSP; DR.
GULICK, SRCI; NURSE AMY MANN,
OSP; NURSE SARAH LADD, OSP, sued
in their official and personal capacities**,

              Defendants.

KING, Judge:

Page 1 - OPINION AND ORDER

Plaintiff, an Oregon Department of Corrections ("ODOC") inmate, brings this civil rights action pursuant to 42 U.S.C. § 1983.  Currently before the court is the State defendants'[1] Motion for Summary Judgment (ECF No. 51).  I also resolve plaintiff's Motion to Compel (ECF No. 33), his second Motion to Compel (ECF No. 36), and his Motion for Stay (ECF No. 43).

## BACKGROUND

Plaintiff brings the following claims for relief:  a challenge to the constitutionality of the ODOC grievance rules; an Eighth Amendment deliberate indifference claim alleging denial and delay of medical care for his abdominal pain and breathing problems; an Eighth Amendment failure to adequately treat his eye condition; and a due process claim challenging the deduction of money from his prison trust account.  Plaintiff's claims arise out of his incarceration at the Oregon State Penitentiary (OSP) and Snake River Correctional Institution (SRCI).

## LEGAL STANDARDS

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The initial burden is on the moving party to point out the absence of any genuine issue of material fact.  Once the initial burden is satisfied, the burden shifts to the opponent to demonstrate through the production of probative evidence that there remains an issue of fact to be tried. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the court "must view the evidence on summary judgment in the light most favorable to the

---

[1]The State defendants consist of the named defendants, with the exception of Sarah Ladd, R.N., who has not yet been served.

non-moving party and draw all reasonable inferences in favor of that party." *Nicholson v. Hyannis Air Service, Inc.*, 580 F.3d 1116, 1122 n.1 (9th Cir. 2009) (citation omitted).

## DISCUSSION

I.    First Claim for Relief:  Unconstitutional Grievance Rules

Plaintiff alleges Colette Peters, the director of ODOC, is liable for a grievance process that is an unconstitutional "maze of barriers, brick walls, dead ends, delay tactics, gotcha tactics with never being able to obtain any equitable relief or corrective action being available to Plaintiff or any other prisoners on medical claims."  Pl.'s Mem. in Supp. of Resp. in Opp'n to Mot. for Summ. J. 9 (ECF No. 66).[2]  Plaintiff seeks to hold Peters responsible based on her alleged authority, responsibility, and duty "to establish DOC policies and procedures of the grievance and grievance review system for inmates confined in DOC facilities."  Pl.'s Decl. in Opp'n ¶ 151 (ECF No. 64) (hereinafter "Pl.'s Decl.").

For example, in his Declaration of Fact and Law (ECF No. 28), plaintiff itemizes the times his grievances were returned to him for grieving more than one person and more than one incident, or for previously grieving similar issues and incidents.  Ex. 5[3] (1/7/2015 grievance alleging breathing problems, stomach pain, and bias from nurses rejected for grieving more than one person and incident); Ex. 9 (1/22/2015 grievance alleging Nurse Mann failed to treat stomach and sciatic pain, or provide medication for breathing problems, returned for grieving

---

[2]I accept this filing even though the parties have completed all the briefing on defendants' Motion for Summary Judgment.  In the future, plaintiff is instructed that he may file one memorandum in opposition to a motion for summary judgment.  The Court usually does not consider unsolicited supplemental briefing.

[3]I reference the number in the upper right hand corner of the document.

similar incident in past); Ex. 18 (1/30/2015 grievance alleging Nurse Ladd's report was false

returned for previously filing a grievance on a similar incident); Ex. 20 (3/31/2015 grievance

complaining about delay in medical care for his stomach/liver/gallbladder area returned for

discussing more than one incident and for having been previously grieved); Ex. 33 (returning

10/7/2014 grievance on cell placement and retaliation by Captain Long).  Plaintiff also references

other exhibits, but he does not produce evidence of the rejection of the receipt of those

grievances.

        Aside from the question of whether Peters was sufficiently personally involved to support

the constitutional claim plaintiff levels against her, courts have held that "[i]nmates do not have a

federal constitutional right to an effective grievance procedure."  *Sanders v. Dickerson*, No. CV-

09-299-ST, 2010 WL 3824077, at *10 (D. Or. Aug. 13, 2010), adopted by 2010 WL 3805511 (D.

Or. Sept. 22, 2010); *see also Mann v. Adams*, 855 F.2d 639, 640 (9th Cir. 1988) (per curiam) ("no

legitimate claim of entitlement to a grievance procedure"); *Ramirez v. Galaza*, 334 F.3d 850, 860

(9th Cir. 2003) (alleged constitutional violation in the processing of inmate's appeals insufficient

to state a claim).

        Consequently, the State defendants are entitled to judgment on this claim and it is

dismissed.

II.    <u>Second Claim for Relief:  Inadequate Medical Care of Abdominal Pain and Breathing
       Problems</u>

        Plaintiff challenges the quality of the medical care he received at OSP and SRCI for

treatment of his abdominal pain and breathing problems.  Compl. at 24.  He alleges this Eighth

Amendment deliberate indifference claim against the following defendants:  Peters, Michael

Gower (the assistant director of ODOC operations), Steven Shelton, M.D. (ODOC's medical

director), C. Coffey (the nurse manager at OSP), Amy Mann, R.N. (a nurse at OSP), and Garth

Gulick, M.D. (the medical director at SRCI).

The treatment a prisoner receives in prison and the conditions of his confinement are

subject to scrutiny under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 31 (1993).

As the Supreme Court has explained,

> The [Eighth] Amendment also imposes duties on these officials, who must
> provide humane conditions of confinement; prison officials must ensure that
> inmates receive adequate food, clothing, shelter, and medical care, and must take
> reasonable measures to guarantee the safety of the inmates[.]

*Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotations omitted).  A

prison official violates a prisoner's Eighth Amendment rights only when the claim satisfies both

an objective and subjective inquiry. *Lopez v. Smith*, 203 F.3d 1122, 1132-33 (9th Cir. 2000).

The State defendants do not argue that the objective element of the Eighth Amendment

inquiry is not met–that element seeks to determine whether the deprivation was sufficiently

serious. *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  In the context of a claim for failure to

provide medical care, plaintiff must establish a "serious medical need." *Estelle v. Gamble*, 429

U.S. 97, 104 (1976).  A serious medical need is the kind of injury that "a reasonable doctor or

patient would find important and worthy of comment or treatment; . . . that significantly affects

an individual's daily activities; or [causes] chronic and substantial pain." *Lopez*, 203 F.3d at

1131 (citation omitted).  Plaintiff's abdominal pain and breathing problems were conditions

worthy of comment and treatment.

The subjective inquiry requires a showing that corrections officers acted with deliberate indifference to plaintiff's serious medical need. *Id.* at 1132. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety . . . ." *Farmer*, 511 U.S. at 837. A difference of opinion as to the specific course of treatment does not establish deliberate indifference. *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012). Instead, plaintiff "must show that the course of treatment [defendants] chose was medically unacceptable under the circumstances, and [he] must show that [defendants] chose this course in conscious disregard of an excessive risk to plaintiff's health." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996) (internal citations omitted).

    A.    <u>Abdominal Pain</u>

Plaintiff alleges feeling abdominal pain and burning since March of 2013, although he first formally complained about the pain and burning in September 2013. At that time, he was prescribed Omeprazole to treat gastroesophageal reflux disease ("GERD"). He complained again in December 2013. He concedes Dr. Rose provided him with medication and gave him an EKG. Defendants report that plaintiff told Dr. Rose on January 9, 2014 that he had stopped taking his Omeprazole, and that Dr. Rose reiterated his diagnosis of GERD and encouraged taking the medication for 30 days and to see how he was doing after the 30-day period. According to plaintiff's Complaint, "several days later" he reported abdominal pain and vomiting, and he was

transferred to the OSP infirmary and given medication.  Compl. ¶ 14.[4]  Plaintiff reported at the time "feeling much better since had Toradol injection."  Pl.'s Decl. Ex. 29.

Plaintiff met with Ole Hansen, M.D. for abdominal pain on February 6, 2014; the doctor ordered an ultrasound.  Plaintiff had the ultrasound on March 13, 2014.  Roger Blair, M.D., reported the results were "unremarkable."  Gulick Decl. ¶ 38.  Nursing staff examined plaintiff's abdomen on April 29, 2014, upon reports of abdominal problems, finding it to be soft and non-tender, and gave plaintiff diet information about GERD at his request on May 4 and May 7, 2014.

Plaintiff did not complain about abdominal pain and burning again until November 7, 2014.  Compl. ¶ 15.  Nurse Mann saw him and prescribed Zantac[5] on November 13, 2014, but plaintiff complains she did not administer any tests and did not diagnose him properly.  Compl. ¶ 16.  He alleges the medication made him sick and nauseous.

About a week later (on November 29, 2014), plaintiff reported to the infirmary complaining of the same symptoms.  The nurse took plaintiff's blood pressure and temperature several times over the eight-hour period, but then sent him back to DSU.  Pl.'s Decl. ¶ 55;  Pl.'s Decl. Ex. 34 (monitor in infirmary for worsening symptoms).  He was not given any pain medication, nor were any tests administered.

---

[4]According to the medical records, plaintiff reported nausea, vomiting and diarrhea after eating lunch on January 16, 2014.

[5]Plaintiff insists Nurse Mann prescribed Omeprazole, not Zantac.  Pl.'s Decl. ¶ 53.  However, the Physician's Orders contains a prescription for "ranitidine" on November 13, 2014, which is the generic name for Zantac.  Pl.'s Decl. Ex. 33B.

About another week went by before Nurse Mann examined plaintiff again, on December 4, 2014. Plaintiff says Nurse Mann told him to drink water, and take over-the-counter antacids, ibuprofen or naproxen. She said there would be no more tests or pain medications. Pl.'s Decl. ¶ 56. The medical notes indicate plaintiff told Nurse Mann the pain had no relationship to food, the Zantac did not help, and he reported he was not having the symptoms that day. Gulick Decl. Attach. 1, at 23. Upon examination, Nurse Mann found no tenderness upon palpation of the abdomen, she heard positive bowel sounds, and observed no acute distress. She ordered lab tests and planned to see plaintiff in two weeks. She discontinued the Zantac. Pl.'s. Decl. Ex. 33B.

Nurse Mann met with plaintiff on December 18, 2014 to inform him that the blood test results indicated no need to see a provider. Pl.'s Decl. Ex. 39. Nurse Mann read plaintiff these blood test results and told him to take over-the-counter antacids as no additional investigation was warranted. Plaintiff complains Nurse Mann kept him waiting in a DSU waiting cell for 20 minutes, only to tell him nothing more would be done for him. However, in a response to plaintiff's grievance appeal, Nurse Bailey wrote, "[Mann] ordered labs and scheduled you for a follow up appointment on 12/18/14 to discuss the results. During your follow up appointment you were unsatisfied with the results of your labs, made several inappropriate comments, and your appointment was terminated." Pl.'s Decl. Ex. 40. Nurse Mann's notes also reflect plaintiff became uncooperative and made inappropriate comments, and when she terminated the appointment he said, "good." Gulick Decl. Attach. 1, at 23. Plaintiff also reports he questioned Nurse Mann's care and her willingness to attend to his medical problems. Pl.'s Decl. ¶ 60.

Plaintiff complained again of breathing problems and abdominal pain, as well as about Nurse Mann's care, on January 5, 2015. Plaintiff was told the next day he was "scheduled for the

doctor's list."  Pl.'s Decl. Ex. 15.  However, plaintiff did not see a provider until January 22,

2015.  Nurse T. Bailey and Supervisor C. Coffey explained to him later that he was scheduled to

see a provider, but the appointment was scheduled for January 22 rather than January 8.  They

"apologize[d] for any confusion that may have occurred in regards to the timing of your

appointment."  Pl.'s Decl. Ex. 21.

Nurse Mann examined plaintiff on January 22, 2015, found his abdomen to be normal,

flat, and with positive bowel signs.  She thought his pain was due to gas or stool movement.

Plaintiff disagreed.  Plaintiff does not dispute that he complained he was not being treated

properly, that he became argumentative and agitated, and that Nurse Mann ended the

appointment.  Pl.'s Decl. ¶ 69.

A little less than a month later, plaintiff was transferred to SRCI.  On March 2, 2015,

plaintiff reported abdominal pain that "comes and goes" and sometimes corresponded to eating;

nursing staff scheduled plaintiff to meet with Dr. Gulick on March 10, 2015.  There is no

indication plaintiff met with Dr. Gulick on that date.  Plaintiff continued to request to see a

specialist for his pain, filing kytes and grievances on March 8, March 31, April 3, and April 9,

2015.  Pl.'s Decl. Exs. 50-53.  ODOC responded to plaintiff either that he was scheduled to see

Dr. Gulick or that he was getting medically sound care.

Plaintiff underwent an ultrasound of his abdomen on April 14, 2015.  Plaintiff sought the

results via kyte on April 21, 2015, and was told to sign up for sick call.  That day, Gower told

plaintiff he had arranged a face-to-face meeting between plaintiff and Robert White, RN, the

nurse manager at SRCI, to take place a few days later.  Pl.'s Decl. Ex. 46.  Plaintiff met with

Nurse White on April 24, 2015, at which time they discussed the fact that plaintiff had access to

NSAIDS and ibuprofen, and that other medications would have to be approved by Dr. Gulick. Nurse White reminded plaintiff diagnostic studies had been ordered to assess his abdominal pain and that if he had future concerns, he could kyte Nurse White who would "check to see that appropriate care regarding his functional abilities are assessed, triaged and appropriate care is provided." Pl.'s Decl. Ex. 47 (notes from meeting with Nurse White on 4/24/2015).

Plaintiff again asked for the ultrasound results via kyte on April 30, 2015, and was told he had an appointment with Dr. Gulick on May 5, 2015. At that appointment, Dr. Gulick examined plaintiff and found plaintiff's abdomen was normal. In addition, plaintiff's ability to sit and stand, and his gait, leg raise, and strength were all normal. The doctor reviewed the most recent ultrasound results with plaintiff. In those results, Howard Schaff, M.D., concluded that plaintiff's liver, gall bladder, and pancreas all looked normal. Gulick Decl. Attach. 1, at 43. Dr. Schaff noted "[m]ild caliectasis [dilation] involving the upper pole of the right kidney. No discrete calculus [kidney stone] is evident." *Id.* Dr. Gulick found "no support for further gallbladder studies such as a hepatobiliary (HIDA) scan. Inmate Farrar's complaints of pain to his lower extremities were mild and intermittent with no findings, so I advised Inmate Farrar to continue taking ibuprofen and Tylenol." Gulick Decl. ¶ 52. Upon Dr. Gulick's consultation with the TLC Committee, the committee decided to have another ultrasound ordered in one year's time. Dr. Gulick opines that, "[b]ased on my personal interactions, my review of the medical records, training and expertise, it is my professional opinion to a reasonable medical certainty that Inmate Farrar has received medical care and treatment for his complaints of abdominal pain within the national standard of care." Gulick Decl. ¶ 58.

Page 10 - OPINION AND ORDER

Plaintiff disputes that the ultrasound was the proper method to assess the cause of his pain, arguing that an MRI or HIDA scan should have been done. He insists his symptoms are representative of classic gallbladder problems and that the State defendants have misdiagnosed his condition. He contends defendants have deliberately refused to diagnose his condition and provide a treatment plan "before it causes plaintiff's death or permanent disability." Pl.'s Decl. ¶ 47. Plaintiff also reports discomfort taking ibuprofen, and that the naproxen carries heart attack and stroke warnings and causes pain and burning in his abdomen.

"A difference of opinion between a physician and the prisoner–or between medical professionals–concerning what medical care is appropriate does not amount to deliberate indifference." *Hamby v. Hammond*, – F.3d –, 2016 WL 1730532, at *5 (9th Cir. May 2, 2016) (quoting *Snow v. McDaniel*, 681 F.3d 978, 987 (9th Cir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014) (en banc)). Instead, "[t]o show deliberate indifference, the plaintiff 'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to the plaintiff's health.'" *Id.* (quoting *Snow*, 681 F.3d at 988).

ODOC defendants have provided medications and two ultrasound tests which revealed unremarkable and normal results. ODOC plans a follow-up ultrasound this year. Plaintiff's disagreement about the testing used to evaluate his pain is merely a difference of opinion and does not amount to deliberate indifference. Indeed, plaintiff has failed to show that the chosen course of treatment "was medically unacceptable under the circumstances" and was chosen "in conscious disregard of an excessive risk to the prisoner's health." *Id.*; *see also Estelle*, 429 U.S.

Page 11 - OPINION AND ORDER

at 107 ("A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment.  At most it is medical malpractice, and as such the proper forum is the state court[.]").  Additionally, although he does not indicate what pain medication he required instead of the ibuprofen or Tylenol that prison providers repeatedly offered him, courts have routinely found that providing over-the-counter medication in lieu of narcotic pain medication does not provide the basis for an Eighth Amendment claim.  *Jackson v. Multnomah Cnty.*, No. 3:12-cv-00764-SI, 2013 WL 428456, at *6 (D. Or. Feb. 4, 2013); *Fields v. Roberts*, No. 1:06-cv-00407-AWI-NP PC, 2010 WL 1407679, at *4 (E.D. Cal. Apr. 7, 2010).

In sum, the evidence demonstrates plaintiff received medical care with which he disagreed.  His belief that the care was inadequate is insufficient to support a claim under the Eighth Amendment.  Since there are no issues of material fact from which a jury could conclude the State defendants were deliberately indifferent to plaintiff's complaints of abdominal pain, this claim must be dismissed.

B.    Breathing Problems

Four years before he began complaining of breathing problems, plaintiff underwent a cardiology evaluation.  At that August 16, 2011 appointment, Karam Ghalili, M.D., administered a number of tests and prescribed several medications for a heart condition.  He examined plaintiff again a year later.  At that time, plaintiff's cardiac examination was normal, but Dr. Ghalili noted a decrease in blood pressure and lipidemia.  He made some medication adjustments and recommended a follow-up in one year.  On June 23, 2013, plaintiff complained of shortness of breath when lying down and he was seen in the infirmary; a provider there told plaintiff to keep his head elevated while in bed, to relax, and to take nitroglycerine tablets for breathing problems.

A doctor examined plaintiff five days later and diagnosed plaintiff with orthopnea, which is shortness of breath occurring when lying flat. The doctor ordered an extra pillow (which plaintiff says is insufficient), an EKG and an x-ray. The x-ray revealed no sign of congestive heart failure. Plaintiff disputes that an x-ray would show signs of heart failure.

In any event, plaintiff saw Dr. Ghalili again in August 2013, at which time plaintiff denied orthopnea. However, due to recurrent chest pain, Dr. Ghalili ordered a treadmill Cardiolite, the results of which compelled the doctor to order an angiogram. The angiogram took place on February 25, 2014 and it revealed "significant left main and 3-vessel disease." Gulick Decl. Attach. 1, at 48. Plaintiff underwent emergency coronary artery bypass surgery that day. Plaintiff was discharged on March 3, and returned to the OSP infirmary. The next day he was moved to DSU. He had a follow-up appointment with Dr. Ghalili at some point in early March 2014,[6] and at that time Dr. Ghalili found plaintiff "clinically stable" but recommended he keep his LDL below 80 and follow up in six months. Plaintiff returned to Dr. Ghalili in September 2014, at which time plaintiff reported severe fatigue, dizziness, and near syncope (loss of consciousness). Dr. Ghalili thought the symptoms were due to hypotension and recommended medication changes. Plaintiff's cardiac examination was normal. Dr. Ghalili planned to follow up with plaintiff in six months.

Plaintiff's allegations related to the defendants' alleged deliberate indifference to his breathing problems begin in early 2015. Plaintiff complained on January 5, 2015 that he had

---

[6]The doctor's medical record bears the date 03/06/2014, but plaintiff points to an ODOC chart note from 3/3/2014 which reads "f/u w/ Ghalili @OSP in 2 weeks." *Compare* Gulick Decl. Attach. 1, at 48 *with* Pl.'s Decl. Ex. 8. Plaintiff contends he did not receive a call pass for the follow-up appointment. Regardless, plaintiff does not dispute he saw Dr. Ghalili following surgery.

problems breathing while lying down. Pl.'s Decl. Ex. 15. He alleges Nurse Mann left before

seeing plaintiff, and that she only visited prisoners in DSU on Thursdays. Compl. ¶ 32. He then

alleges that Nurse Mann called in sick on January 15, 2015, so that he did not see a provider until

on or about January 22. Plaintiff alleges that at that time, Nurse Mann ordered an EKG and a

breathing test, which he alleges was inadequate because it did not operate properly and provided

no relief. Compl. ¶ 34.

Dr. Shelton's response to plaintiff's grievance appeal on the issue of medical care leading

up to the breathing test reveals plaintiff was "not in apparent distress at the time of your request;

had there been any apparent urgent needs, you would have been seen immediately." Pl.'s Decl.

Ex. 23. Dr. Shelton then indicated there were daily health access checks. The nurse signed

plaintiff up to see someone on January 22. On that day, the provider ordered a chest x-ray and

spirometry (a test to diagnose asthma, COPD, and other breathing problems). A chest x-ray was

done on January 26, 2015. "Since that date there is documentation that you were non-compliant

with the ordered spirometry and argumentative with your provider when in the clinic. No other

new symptoms pertaining to this concern have arisen." Pl.s Decl. Ex. 23. Dr. Shelton thought

plaintiff's symptoms had been adequately evaluated.[7] Nurse Mann also concluded there was no

medical need for further intervention. Plaintiff himself reports that his "respiratory symptoms

when lying down at rest, on its own eased up around the first week of February 2015." Pl.'s

Decl. ¶ 35.

---

[7]The January 23, 2015 chart note reads: "During spirometry test, patient demonstrated
minimal effort before exhale. Did not blow (empty his lungs)/exhale entire capacity of both
lungs, and did not count 6 seconds while expelling volume from lungs." Pl.'s Decl. Ex. 24B.

After filing several grievances, and grievance appeals, Gower set up a face-to-face meeting with Nurse White at which plaintiff discussed his medical concerns, including his breathing problems while lying flat. Nurse White reminded plaintiff of his extra pillow, which plaintiff did not feel was sufficient. Nurse White also reminded plaintiff he could request a medical evaluation if he experienced shortness of breath. Nurse White informed plaintiff he could kyte Nurse White with "future concerns and that although [he] cannot prescribe, [he] can check to see that appropriate care regarding [plaintiff's] functional abilities are addressed, triaged, and appropriate care is provided." Pl.'s Decl. Ex. 47.

The crux of plaintiff's Complaint with respect to his breathing problems appears to be that Nurse Mann and Nurse Coffey ignored his complaints of respiratory problems during January, and failed to provide him with adequate relief from his symptoms (i.e. an inhaler to help him breathe). Compl. ¶¶ 32-34; *see* Pl.'s Decl. ¶¶ 7, 25-27; Pl.'s Mem. of Law 11.

First, with respect to the delay in medical care between plaintiff's first complaint of breathing problems on or about January 5 or 6 until January 22 or 23, 2015, plaintiff produces no evidence that any of the defendants were aware of an "excessive risk" to his health and safety. *Snow*, 681 F.3d at 988; *see also Wood v. Housewright*, 900 F.2d 1332, 1335 (9th Cir. 1990) (delay in medical care only rises to a constitutional violation if it caused the prisoner "substantial harm"); *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam) ("mere delay of surgery" is not deliberate indifference "unless the denial was harmful"); *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (deliberate indifference prong requires "harm caused by the indifference").

Page 15 - OPINION AND ORDER

Here, as plaintiff himself concedes, his "respiratory symptoms when lying down at rest, on its own eased up around the first week of February 2015." Pl.'s Decl. ¶ 35. He presents no evidence that he suffered any harm as a result of the delay. Second, with the exception of a grievance appeal in late July 2015, after the period at issue in his Complaint, there is no indication plaintiff ever asked for an inhaler or discussed whether its use would be appropriate for him at the time of his experiencing the troubling symptoms. Given the evidence of daily health checks, the access to health care should plaintiff's condition have indicated an urgent need, the meeting with Nurse White to discuss all of plaintiff's medical problems, and the fact that plaintiff's symptoms resolved on their own, I find there are no material issues of fact to support a finding that the State defendants engaged in deliberately indifferent conduct toward plaintiff's medical needs. As a result, this claim is dismissed.

III.    <u>Third Claim for Relief:  Inadequate Eye Care</u>

Plaintiff additionally alleges Dr. Shelton and Nurse Ladd were deliberately indifferent to his need for eye care. Specifically, he alleges Nurse Ladd submitted a "misleading eye examine report to indigent eye committee with performing a inadequate eye examine" and both defendants "subjected plaintiff to repeated unnecessary delays [due] to plaintiff's indigency, in providing adequate professional eye examination with needed prescription eye glasses subjecting plaintiff to the possibility of permanent disability" as well as stress, headaches, chest pain, nausea and depression. Compl. 17, 24-25. In his declaration, plaintiff asserts he reported having problems with his eyes and was concerned about loss of vision. He was told he was placed on the list for an eye exam. On December 31, 2014, plaintiff complained again and Nurse Ladd responded that eye exams cost $45. She directed him to complete a form and submit it to Optical, and that once

the funds were reserved, he would be scheduled fr an appointment.  Pl.'s Decl. Ex. 64.  When plaintiff reported he could not afford the $45, Nurse Ladd responded on January 9, 2015 that she would place plaintiff on the indigent review list.  Pl.'s Decl. Ex. 65.  On January 15, Nurse Ladd performed an eye exam and found plaintiff had 20/40 vision in his left and right eyes.  She recommended reading glasses from the canteen and suggested he reapply in six months.  The Eyeglasses Review Committee, made up of Nurse Ladd and three others, agreed.  Pl.'s Decl. Ex. 67.

In response to a grievance submitted by plaintiff, Nurse Ladd summarized these events: at plaintiff's request for indigent approval, his case was referred to the committee charged with evaluating vision and programming status.  Before that committee met, plaintiff's vision was tested.  "Your visual acuity did not show a significant vision loss.  Per DOC policy, it is recognized that the lack of correction eyewear does not cause deterioration in a person's general state of health, therefore, the committee recommended you re-apply in 6 months and try reading glasses during that time."  Pl.'s Decl. Ex. 69.  Plaintiff appealed Nurse Ladd's response to his grievance.  In his grievance appeal, he reported he could no longer read small print, that the reading glasses available in the commissary hurt his eyes, that his legal work and bible studies necessitated reading small print for long hours, and that Nurse Ladd's eye examination was inadequate, false and misleading.

Dr. Shelton responded to plaintiff's grievance appeal in March 2015, saying that reading glasses and review in six months "was certainly an appropriate reply for your circumstances at that time."  Pl.'s Decl. Ex. 71.  Gower agreed in May.  The Eyeglasses Review Committee later

Page 17 - OPINION AND ORDER

approved plaintiff's indigent eye exam request in November 2015, on an examination revealing 20/200 vision.  Plaintiff had his eye examination in December 2015.

The only defendants plaintiff names in his Complaint with respect to his eye care claim are Dr. Shelton and Nurse Ladd.  With regard to Dr. Shelton, the only factual allegation plead by plaintiff is that the doctor approved of the Eyeglass Review Committee's January 2015 conclusion that plaintiff should try reading glasses and reapply in six months.  The State defendants correctly argue Dr. Shelton cannot be liable as a supervisor under section 1983, absent facts demonstrating "the supervisor participated in or directed the violations, or knew of the violations and failed to act to prevent them."  *Taylor v. List*, 880 F.2d 1040, 1045 (9ᵗʰ Cir. 1989).  According to the State defendants, participating in the administrative grievance process is insufficient to constitute personal involvement, citing *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 503 (S.D.N.Y. 2012) and *Odom v. Calero*, No. 06-cv-15527, 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008).

In the Ninth Circuit, "a prison administrator can be liable for deliberate indifference to a prisoner's medical needs if he 'knowingly fail[s] to respond to an inmate's requests for help."  *Peralta v. Dillard*, 744 F.3d 1076, 1086 (9ᵗʰ Cir. 2014) (en banc), quoting *Jett*, 439 F.3d at 1098 (directed verdict affirmed where Chief Medical Officer participated in second level appeal, absent evidence he was aware of any risk to inmate's health; he supervised the dental department, but was not a dentist, and did not review chart; he relied on medical opinions of staff dentists).  Thus, plaintiff must show Dr. Shelton was involved in the decision to deny the requested eye examination or had control over the medical care given to plaintiff, and knew of an excessive risk to plaintiff's health caused by the denial of the eye examination.  *See Toguchi v. Chung*, 391

F.3d 1051, 1057-58 (9th Cir. 2004) (prison official is deliberately indifferent if knows of and disregards an excessive risk to inmate's health); *Starr v. Baca*, 652 F.3d 1202, 1207-08 (9th Cir. 2011) ("The requisite causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or should have known would cause others to inflict a constitutional injury." (citation, quotation marks, and internal alterations omitted)).

Plaintiff produces no evidence of Dr. Shelton's control over plaintiff's eye care and, more importantly, that plaintiff's grievances demonstrated to Dr. Shelton an excessive risk to plaintiff's eye health caused by Nurse Ladd's recommendation (and the Eyeglass Review Committee's agreement) that plaintiff first try reading glasses available in the commissary and reapply in six months. Therefore, I grant summary judgment in Dr. Shelton's favor on plaintiff's third claim for relief.[8]

Plaintiff has failed to serve the other defendant against whom he alleges this claim, Nurse Ladd. By separate minute order, I provide instructions for plaintiff to initiate service of the Complaint to Nurse Ladd.

IV.    Claim Four:  Unconstitutional Collection of Disciplinary Sanctions

Finally, plaintiff alleges Peters and Bob Culp, the supervisor of the Central Trust Inmate Accounts, acted with deliberate indifference toward his trust account property. He contends

---

[8]Despite referencing other individuals in his brief and supporting materials (Peters, Gower, Coffey, and members of the Eyeglasses Review Committee), plaintiff only named Dr. Shelton and Nurse Ladd in his Complaint. Even if I were to allow plaintiff permission to amend his Complaint at this late date, there is nothing in the evidence reflecting any of these other defendants had control over plaintiff's eye care and knew of an excessive risk to his eye health by the care recommended by Nurse Ladd, and accepted by the Eyeglass Review Committee.

these defendants unlawfully collected $45.00 from his trust account during the Christmas holiday buying period "that was protected under the Entitlement to Exemption from Doc debt collection under OAR 291-158-0065(4)." Compl. 25. Plaintiff also alleges State defendants unlawfully collected the money without first giving him notice and an opportunity to be heard prior to seizing the money. Plaintiff faults Peters for failing to investigate or offer any corrective action to what he alleges was an intentional scheme to unlawfully collect prisoners' Christmas money.

The Fourteenth Amendment prevents a state from depriving a person of his property without due process of law. Courts recognize a prisoner's property interest in his funds maintained in a trust account. *Quick v. Jones*, 754 F.2d 1521, 1523 (9th Cir. 1985); *Vance v. Barrett*, 345 F.3d 1083, 1088 n.6 (9th Cir. 2003). Plaintiff does not challenge, in this claim, the underlying reason for depriving him of his property, or the procedures used in the disciplinary hearing itself, just *when* the sanction was imposed. Nor could he. Here, plaintiff was advised of a disciplinary hearing based on a misconduct report that he had distributed heroin. At plaintiff's October 27, 2014 hearing, a disciplinary hearings officers found plaintiff had possessed and distributed a controlled substance and recommended a sanction of $100 along with other penalties. ODOC approved the $100 sanction on October 30, 2014. Plaintiff appealed the result and the sanction in his November 13, 2014 petition for administrative review. On November 17, 2014, the ODOC Inspector General acknowledged receipt of the petition and, after review, found "substantial compliance with the rule" and an outcome supported by a preponderance of the evidence. Culp Decl. Attach. 6, at 1. Additionally, the Inspector General concluded the "sanction imposed was in accordance with the provisions set forth in the rule. Refer to OAR 291-105-85(3)(4)." *Id.* State defendants complied with due process. *See Wolff v. McDonnell*,

418 U.S. 539, 564-66 (1974) (written notice, time to prepare, opportunity for hearing, written

decision by fact-finder required).

The sanction, however, was not deducted from plaintiff's trust account until December

10, 2014, after plaintiff's family had deposited a sum of money for his use during the Christmas

season.  Plaintiff takes issue with this timing.  Normally, an inmate who owes ODOC money is

permitted to spend on commissary one half of the first $60 (up to $30) each calendar month.

OAR 291-158-0065.  The remainder of the funds are applied to the debt until the debt is

satisfied.  ODOC management has discretion to increase the amount of money an inmate may

spend during the holiday season.  OAR 291-158-0065(4).  Specifically,

> (4) Annual Holiday Period:  During one annual holiday period, the Assistant
> Director of Operations or Institution Administrator may allow a standard increase
> in the amount of funds an inmate may spend from their trust account designated
> for the purchase of gifts or other approved items.  The standard increase and
> holiday period will be the same for all functional units and will be exempt from
> collection for an inmate's Department of Corrections debt.  Any unused funds
> remaining to an inmate's trust account at the end of the designated period will be
> applied to the inmate's indebtedness.

Inmates may dispute debts collected from their trust accounts via administrative review.

OAR 291-158-0065(3).

Just before the holiday period in question, on November 3, 2014, Gower issued a

memorandum to all inmates about suspending collection of debts during the holiday period.

Specifically, he informed the inmates that the holiday buying period would begin December 1,

2014, and end January 2, 2015.  He permitted doubling of spending limits during that time.  He

informed the inmates that "November debt collection will take place by Nov. 28, prior to the

beginning of the holiday buying period."  Culp Decl. Attach. 2.  Additionally, during this period,

Page 21 - OPINION AND ORDER

"central trust will not collect existing DOC debt.  However, non-DOC debt, such as court fees

and garnishment orders, will be collected during the buying period, *as well as fines associated*

*with new disciplinary sanctions*."  *Id.* (emphasis added).

According to Culp, ODOC's Trust Account Office received a report of disciplinary fines

to deduct from several inmates' trust accounts, including plaintiff's, on December 5, 2014.  The

report identified disciplinary order dates ranging from late October through early November.

Culp's office deducted the $45 from plaintiff's trust account on December 10, 2014.  According

to Culp, it takes ODOC about five weeks to process and deduct the fines resulting from

disciplinary proceedings.  Here, plaintiff's debt was not subject to the holiday suspension

because it was a new disciplinary sanction.  Plaintiff sought administrative review of the

deduction.  Culp responded, "No error has been found in the collection of debt on your trust

account.  If you look at the timing of any of your old fines you will see this same lag in time.

Disciplinary fines are considered 'new' when they are put on your trust account."  Pl's. Decl. Ex.

102.

To the extent plaintiff argues the State defendants did not give him pre- and post-

deprivation notice and opportunities to be heard, the record flatly refutes his assertion.  To the

extent plaintiff argues that his sanction was not a "new disciplinary sanction" under his reading

of the regulations and, therefore, should not have been deducted from his trust account during the

holiday season, plaintiff's disagreement with the State defendants' interpretation of regulations

does not demonstrate a violation of his due process rights.  *Cousins v. Lockyer*, 568 F.3d 1063,

1070-71 (9th Cir. 2009) (failure to comply with prison regulations does not amount to a

constitutional violation).

In sum, plaintiff received sufficient process to be protected from the arbitrary deprivation of his property and this claim must be dismissed.

V.    <u>Remaining Motions</u>

In plaintiff's Motion to Compel (ECF No. 33), plaintiff seeks evidence he claims is relevant to his fourth claim for relief–the allegedly unlawful deductions from his trust account. Plaintiff seeks other prisoners' disciplinary records from June 1, 2014 through November 30, 2014 in an effort to establish that ODOC intentionally withheld or posted sanctions late in order to collect debt during the holiday season.  ODOC defendants object to the request as overbroad, burdensome, and not reasonably calculated to lead to admissible evidence.  They contend the documents are privileged and exempt from disclosure pursuant to ORS 192.502(5) (involving the "rehabilitation of a person in custody") and that disclosing the documents would pose a security threat to OSP.  ODOC defendants further explain that knowledge of inmate debt could be used to extort, blackmail, and undermine rehabilitation of inmates.  I agree and deny this motion.

In plaintiff's second Motion to Compel (ECF No. 36), plaintiff seeks responses to his requests for admissions.  The ODOC defendants object because plaintiff's requests are vague, ambiguous and unduly burdensome.  In addition, they do not comply with Federal Rule of Civil Procedure 36(a)(1), which requires that the requests be directed to a specific party.  The requests for admission are directed at those individuals who allegedly failed to provide plaintiff with medical care.  The medical records speak for themselves.  I deny this motion.

Finally, I deny as moot plaintiff's Motion for Stay (ECF No. 43)

**CONCLUSION**

Based on the foregoing, the State defendants' Motion for Summary Judgment [51] is granted and Peters, Gower, Culp, Shelton, Coffey, Gulick, and Mann are dismissed with prejudice.  The only remaining defendant is Sarah Ladd, who has not yet been served.  Plaintiff's Motions to Compel [33, 36] and Motion for Stay [43] are denied.

IT IS SO ORDERED.

DATED this __3rd__ day of June, 2016.


    /s/ Garr M. King
    Garr M. King
    United States District Judge